**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

BRIAN WATSON, W.D.C. HOLDINGS, LLC D/B/A Northstar Commercial Partners, NORTHSTAR COMMERCIAL PARTNERS MANAGEMENT, LLC, and NSIPI ADMINISTRATIVE MANAGER, LLC,

Plaintiffs,

v.

IPI PARTNERS, LLC, IPI DATA CENTER PARTNERS FUND I-A, LP, IPI DATA CENTER PARTNERS FUND I-B, LP, STACK INFRASTRUCTURE, INC., ICONIQ CAPITAL, LLC, IRON POINT PARTNERS, LLC, MATTHEW A'HEARN, LUKE GILPIN, and NITIN SATHE.

Defendants.

---

**COMPLAINT
JURY TRIAL DEMANDED**

---

Plaintiffs Brian Watson ("Watson"), W.D.C. Holdings, LLC d/b/a Northstar Commercial Partners ("Northstar"), Northstar Commercial Partners Management, LLC ("Northstar CPM"), and NSIPI Administrative Manager, LLC ("NSIPI," together with Northstar and Northstar CPM, "Northstar Entities," and collectively "Plaintiffs"), by and through their undersigned counsel, Greenspoon Marder LLP, respectfully submit this Complaint against defendants IPI Partners, LLC ("IPI"), IPI Data Center Partners Fund I-A, LP ("IPI Fund I-A"), IPI Data Center Partners Fund I-B, LP ("IPI Fund I-B"), STACK

Infrastructure, Inc. ("STACK"), ICONIQ Capital, LLC ("ICONIQ"), Iron Point Partners, LLC ("Iron Point"), Matthew A'Hearn ("A'Hearn"), Luke Gilpin, ("Gilpin"), and Nitin Sathe, ("Sathe," and collectively "Defendants") and hereby state and allege as follows:

## INTRODUCTION

1.     This case arises from the insatiable greed of a prominent Silicon Valley investment fund, IPI, whose managers executed a mafia-like scheme—involving witness tampering, suborning perjury and bribery—to steal from Mr. Watson an exceptionally valuable business relationship with Amazon, and in doing so, coldly and intentionally destroyed his life's work, ruined his reputation, and extinguished his ability to earn a living, all for the sake of earning more fees for itself and a higher rate of return for its billionaire investors.

2.     As part of an organized enterprise, Defendants manipulated the Department of Justice ("DOJ") into investigating and pursuing Mr. Watson and Northstar by manufacturing a false narrative of a corrupt business relying on bribery and kickbacks that Defendants used as a pretext to wrongfully displace Plaintiffs from their lucrative and growing business relationship with Amazon.

3.     This scheme was based on false and incomplete testimony IPI obtained through promises of lucrative compensation to witnesses—and simultaneous threats if the witnesses did not cooperate. One such person explained the Defendants' methods in a telephone call in early 2024, stating:

> Now, if somebody put me on the stand and said '**Did somebody want to pay you x millions of dollars to come work for them and to take over this Amazon relationship if x, and y, and z happened**,' I would say '**yes and here's how it happened**.'

4.      That second "somebody" was Chicago-based IPI and the other Defendants, as the witness explained:

> I have been flown to Chicago ten times and I can tell you what that means. From IPI. I can tell you when and where, the dates, the plane tickets, **I can tell you how they were trying to undo Brian [Watson] before all this sh\*t**.

5.      Defendants "convinced" these people to misleadingly describe an industry-standard referral fee paid by Northstar as a kickback in order to incite a governmental investigation of Mr. Watson and Northstar, which they then used to defame Mr. Watson and Northstar, terminate their joint venture, and to deceive Amazon into terminating Northstar's data center development projects and going into business with IPI.

6.      For Defendants, their conspiracy was about nothing more than making more money for its managers and a few extra percentage points of investment returns for its uber wealthy clients. Although the DOJ ultimately dropped its investigation of Mr. Watson without any charges, the damage had been done. Defendants' scheme ruined Mr. Watson's personal and professional life.

7.      In 2017, Mr. Watson was introduced to Amazon for potential real estate development work for Amazon Web Services ("AWS"), Amazon's web hosting business—the largest and most profitable division of Amazon. Amazon asked Mr. Watson to submit a proposal to develop core and shell buildings in Virginia to be used as data centers after Amazon built them out to its own specifications. Amazon told Mr. Watson that Northstar's bid was the most competitive on proposed terms among several submissions and awarded Northstar its first project. Mr. Watson and Northstar looked at the project in Virigina as the first of many projects on which Northstar would, assuming it was successful, work for Amazon.

8.      As the initial project was large and Northstar correctly anticipated being retained by Amazon to develop numerous sites for data centers, Mr. Watson and Northstar sought an equity partner that would be interested in funding such projects. Mr. Watson was introduced to IPI, who had created a relatively new investment fund of $1.5 billion of new capital funded by several tech billionaires, including Mark Zuckerberg, the founder and CEO of Meta (Facebook). IPI was itself a joint venture of defendants Iron Point and ICONIQ, which themselves invest funds for ultra-high net worth clients, reported to include Zuckerberg and Jack Dorsey (co-Founder and former CEO of Twitter and Block, Inc. which is the developer of Square financial), captains of finance such as Henry Kravis (co-Founder of KKR & Co.), and Hollywood entertainers, such as Will Smith, Ashton Kutcher, and Ryan Reynolds.

9.      IPI and its principals, Defendants Matthew A'Hearn and Luke Gilpin, came to Colorado to perform diligence on Mr. Watson and Northstar and learned about Mr. Watson's operations, practices, personnel, and other projects under ownership and management. IPI was impressed by Northstar's and Mr. Watson's knowledge and real estate investment and development experience, which IPI did not have.

10.     The first data center project was a tremendous success, and after more competitive processes, Amazon committed to engaging Northstar to develop several more data centers. Recognizing the potential for future income and opportunities, in the summer of 2019, IPI tried to buy out Mr. Watson's and Northstar's interest in all Amazon data center projects for $20 million. Mr. Watson declined their $20 million offer, happy with the Amazon business and its growth potential.

11.     For Mr. Watson and Northstar and all its employees, everything changed on April 2, 2020. That day, the Federal Bureau of Investigation ("FBI") showed up at Mr. Watson's door with a search warrant and raided his home. The FBI told Mr. Watson that he was the target of a criminal investigation in the Eastern District of Virginia and should expect to be indicted.

12.     A few hours later, IPI delivered termination notices to Mr. Watson and numerous Northstar entities, effectively ending Northstar's role as a general partner and manager of the development center projects and taking over all of Mr. Watson's and Northstar's Amazon business without paying a dime—let alone the $20 million it had offered him only months earlier. The raid and immediate termination by IPI came as a complete shock to Mr. Watson, given that he had received only positive feedback from Amazon through that date and that neither he nor Northstar was ever sent any formal notice of default by either Amazon or IPI (which would have provided him and Northstar a right to cure).

13.     Mr. Watson was confused, horrified, and embarrassed that everything he had spent decades building had been taken from him. He was brought to the verge of self-harm as everything he had worked to achieve suddenly had been taken away, going so far as to draft a suicide note to his family, friends, and business contacts.

14.     Over the next few weeks, Mr. Watson learned that he was accused of paying kickbacks to Amazon employees to win the data center deals. He had done no such thing.

15.     But IPI was relentless in its campaign against Mr. Watson and successfully encouraged the DOJ and Amazon to pursue Mr. Watson. Based on the misleading statements that employees intimidated by IPI had provided, Amazon and its lawyers,

including a former federal prosecutor in the Eastern District of Virginia, filed a massive civil lawsuit against Mr. Watson and Northstar in that district. Also based on IPI's incitement and as part of IPI's scheme, the United States Attorney for the Eastern District of Virginia continued to investigate bogus potential criminal charges against Mr. Watson, despite his denial of wrongdoing and cooperation in presenting the facts.

16.     At first, Mr. Watson's position seemed hopeless. Mr. Watson's purported co-conspirators, overwhelmed by Defendants' scheme, entered guilty pleas, and Mr. Watson and Northstar suffered early setbacks in the civil case. But with the passage of time and the exchange of discovery, the case against Mr. Watson began to fall apart.

17.     In the civil case, many of the affidavits on which plaintiffs had relied to win their initial motions were retracted after the affidavits, based on information that IPI had obtained, were revealed to be unfounded and false. Then, following the exchange of documents and depositions, the court dismissed nearly all claims against Mr. Watson at summary judgment.[1]

18.     Next, in dramatic proof of Defendants' manipulation of the judicial process, the DOJ took the dramatic step of vacating the guilty pleas that Mr. Watson's purported accomplices had been bullied into entering, announcing that pursuing the claims was "no longer in the interest of justice." To this date, Mr. Watson has not been informed of the details of the almost five-year investigation, even after the DOJ announced the investigation was over.

---

[1] Indeed, only a single state-law claim, on which Amazon suffered no financial harm, remains.

19. The DOJ has now confirmed to Mr. Watson that he is no longer under investigation.

20. It is now clear that IPI and its principals, including Defendants A'Hearn, Gilpin, and Sathe, concocted a scheme to steal what they could not cheaply buy in the summer of 2019: Mr. Watson's relationship and data center development and ownership business with Amazon.

21. Multiple people have now admitted that IPI pressured them to provide misleading testimony to the DOJ in order to instigate an investigation or Mr. Watson, without regard to the truth or completeness of the testimony. IPI and its co-conspirators went so far as to fly witnesses to Chicago, where IPI is based, to coach them in advance of interviews with the DOJ. One witness recently admitted that IPI's pressure campaign lasted for at least 18 months and that IPI promised him huge rewards if he would cooperate and implicate Mr. Watson. Although funded by Silicon Valley oligarchs, IPI's practices of witness tampering and bribery are reminiscent of the infamous strong-arm, mafia crime practices of Chicago, where IPI is based. Defendants' conspiracy is the very type of enterprise that RICO and similar state statutes were enacted to discourage and prevent.

22. Although the vast bulk of the documents exchanged in the civil case have largely been kept hidden by a strict confidentiality order protecting IPI, and though the DOJ has refused to disclose the details of its now-abandoned investigation, even the limited facts exposed to date reveal a fraudulent conspiracy perpetrated by the Defendants to steal Mr. Watson's and Northstar's business for no other purpose than to provide more personal compensation for the founders, employees, partners, and

managers of IPI and to juice the returns of IPI's investors—all at the expense of Mr. Watson's livelihood.

23.     The amount of money at issue is massive, and IPI's Silicon Valley-elite benefitted handsomely from IPI's theft of Mr. Watson's business. Not only did IPI take over the data center projects that Mr. Watson had already built for Amazon, but IPI also inherited all the data center construction projects in the pipeline—and those yet to come. IPI now lists Amazon as one of its top three "business partners" in its marketing materials and presentations to investors such as state pension funds, many of which have invested with IPI. IPI has grown on four continents with over $20 billion of invested capital and ownership holdings in the billions as well. IPI's financial records are not public, but it appears that IPI has earned huge sums even to date and stands to earn billions more in the future.

24.     In this action for civil RICO, Colorado Organized Crime Control Act, malicious prosecution, abuse of process, defamation, and other torts, Mr. Watson will expose the details of Defendants' scheme, hold them to account for their actions, and recover what they stole from him.

**THE PARTIES**

25.    Plaintiff Brian Watson is an individual residing in Colorado since 1981.

26.    Plaintiff W.D.C. Holdings, LLC d/b/a Northstar Commercial Partners is a Colorado limited liability company founded in 2000 by Mr. Watson, engaged in commercial real estate ownership, development, management and investment, and headquartered in Colorado. W.D.C Holdings submitted proposals for, and was awarded, the Amazon data center projects and received fees for work performed.

27.    Plaintiff Northstar Commercial Partners Management, LLC is a Colorado limited liability company founded in 2002 by Mr. Watson and engaged in commercial real estate property management. This entity was engaged to provide property management services to the Amazon data centers for fee income. Its principal place of business is Denver, Colorado.

28.    Plaintiff NSIPI Administrative Manager, LLC is a Delaware limited liability company formed for the purpose of holding an equity interest in the Amazon data center joint venture. This entity was engaged to provide administrative management services to the limited liability company formed to develop the Amazon data center projects, NSIPI Data Center Venture, LLC. Its principal place of business is Denver, Colorado.

29.    Defendant IPI Partners, LLC is a Delaware limited liability company with a principal place of business in Chicago, Illinois, and has transacted business within the state of Colorado with Colorado counterparties, partners, and investors, including visiting Northstar's offices in Colorado to perform due diligence on, and to transact with, Plaintiffs.

30.    Defendant IPI Data Center Partners Fund I-A, LP is a Delaware limited partnership with a principal place of business in Chicago, Illinois, and has transacted business within the state of Colorado with Colorado counterparties, partners, and

investors, including visiting Northstar's offices in Colorado to perform due diligence on, and to transact with, Plaintiffs.

31.     Defendant IPI Data Center Partners Fund I-B, LP is a Delaware limited partnership with a principal place of business in Chicago, Illinois, and has transacted business within the state of Colorado with Colorado counterparties, partners, and investors, including visiting Northstar's offices in Colorado to perform due diligence on, and to transact with, Plaintiffs.

32.     Defendant STACK Infrastructure, Inc. is a Delaware corporation with a principal place of business in Denver, Colorado. STACK was formed from IPI's previously acquired properties in early 2019 and sponsored by IPI as a data center property development company and property manager. Upon information and belief, STACK took over certain of Northstar's existing and future business in 2020 after IPI removed Northstar pursuant to the scheme described herein.

33.     Defendant ICONIQ Capital, LLC is a Delaware limited liability company with a principal place of business in San Francisco, California, and has transacted business within the state of Colorado with Colorado counterparties, partners, and investors.

34.     Defendant Iron Point Partners, LLC is Delaware limited liability company with a principal place of business in Washington, DC, and has transacted business within the state of Colorado with Colorado counterparties, partners, and investors.

35.     Defendant Matthew A'Hearn, an individual residing in Illinois, is a co-founder and Managing Director of IPI and has transacted business within the state of Colorado with Colorado counterparties, partners, and investors, including visiting Northstar's offices in Colorado to perform due diligence on, and to transact with, Plaintiffs.

36.     Defendant Luke Gilpin, an individual residing in Illinois, is a co-founder and Managing Director of IPI and has transacted business within the state of Colorado with Colorado counterparties, partners, and investors, including visiting Northstar's offices in Colorado to perform due diligence on, and to transact with, Plaintiffs.

37.     Defendant Nitin Sathe, an individual residing in Washington, D.C., is Iron Point Partners' Chief Compliance Officer and General Counsel, as well as IPI's General Counsel, and has transacted business within the state of Colorado with Colorado counterparties, partners, and investors.

## JURISDICTION AND VENUE

38.     This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 because the Racketeer Influenced and Corrupt Organizations Act ("RICO") is a federal statute. This Court also has supplemental subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

39.     This Court has personal jurisdiction over Defendants because each either can be considered essentially at home in this district or has committed acts giving rise to Plaintiffs' claims within and directed to this judicial district. Moreover, this Court has personal jurisdiction over the Defendants by virtue of 18 U.S.C. § 1965(b).

40.     Venue in this District is proper pursuant to both 28 U.S.C. § 1391(b)(2) because the incidents giving rise to the causes of action occurred in the State of Colorado and 18 U.S.C. § 1965(a) because a person against whom a RICO claim is asserted is either found, has an agent, or transacts his affairs in this district.

**FACTS**

I.  **Brian Watson Founds and Builds Northstar into a Billion Dollar Real Estate Investment Company**

41.     Plaintiff Northstar is a privately held, full-service commercial real estate development, investment and asset management company. Plaintiff Watson founded Northstar in 2000. Northstar specializes in the development, acquisition, and re-development of commercial real estate assets throughout the United States.

42.     By 2020, Northstar had grown—through Mr. Watson's efforts—to an enterprise with more than 40 employees and $1.3 billion in assets across 17 states throughout the country. Northstar had internal acquisition, asset management, property management, accounting, debt, equity, and development professionals.

43.     Northstar had a proven track record of success. Since its inception, Northstar had acquired 140 assets, amounting to over 14.4 million square feet of real estate. It had worked with many Fortune 500 companies in the ownership and management of commercial real estate.

44.     Moreover, Northstar had expertise in cost-effective development as an entrepreneurial company, making it a prime partner for digital companies, like Amazon, in developing lower cost buildings to be used as data centers.

45.     Northstar commonly used and paid referral partners who made introductions to potential deals, capital sources, and development partners. Those referral partners typically had contacts in various industries or would research potential companies or individuals that Northstar or Mr. Watson should meet. Northstar did not keep this referral partnership program secret. To the contrary, Northstar promoted it publicly, even on its YouTube channel.

46.     This is a common practice in the commercial real estate business. Most, if not all, commercial real estate development companies have relationships with individuals or companies that refer potential acquisition or development projects. Northstar was not unique in having such relationships.

47.     Northstar itself routinely worked with companies and individuals who would introduce Northstar to potential partners for new real estate acquisitions and developments.

48.     In total, Northstar worked with *hundreds* of such referral partners. One was Christian Kirschner ("Christian").

49.     Mr. Watson met Christian during the 1990s when they both worked as associates at Cushman & Wakefield of Colorado, a prominent, full-service, global commercial real estate brokerage firm, in its Denver, Colorado, offices.

50.     Beginning in September 2016, Northstar and Christian had an ongoing referral relationship, in which Christian received a monthly fee ($4,000) in exchange for research and introductions to potential partners. In addition, if an introduction led to a fruitful business opportunity for Northstar, Christian was entitled to additional compensation.

51.     Pursuant to this arrangement, Christian made over 1,000 introductions to Northstar. Several of these introductions resulted in potential business opportunities.

## II.     **Northstar Is Introduced to Amazon and Negotiates the First Data Center Deal**

52.     In July 2017, Christian arranged for a meeting between Mr. Watson and Casey Kirschner ("Casey"), Christian's brother, who worked as a transactional manager in the real estate department of Amazon and AWS.

53.     Mr. Watson toured Amazon's ongoing data center projects in Virginia with Casey, and Casey interviewed Mr. Watson regarding his real estate investment and development experience and track record.

54.     During the tour of the Virginia market, Casey also interviewed Mr. Watson regarding Northstar's capabilities, knowledge, staffing, and expertise. Casey was impressed and thought that Northstar had the potential to be a valuable addition to the development company options that Amazon had. Casey recommended that Northstar be invited to visit Amazon's headquarters in Seattle to make a formal presentation to his boss, Carl Nelson, who was the Head of the Americas for Amazon's data center business.

55.     That successful meeting with Casey, in July 2017, meant Northstar had cleared the first informal interview and—as recommended—was invited to make a formal presentation regarding its capabilities to Amazon corporate leadership at Amazon's Seattle headquarters on August 24, 2017.

56.     The Northstar team that traveled to Seattle to present to Amazon included Mr. Watson, Donald Marcotte, Northstar's development manager, and Jaime Jones Vantsa, Northstar's Director of Acquisitions and Dispositions. Amazon's representatives at the presentation included Casey, Casey's supervisor Nelson, and other Amazon personnel who were introduced to Northstar.

57.     The presentation to Amazon's representatives was successful, and Northstar was invited to participate in the next step in the process, which was to submit a written response to a competitive request for proposal ("RFP") process for development and ownership of Amazon data centers in Northern Virginia, for which Amazon would be the exclusive tenant/leaseholder.

58.     In response to Amazon's invitation, Northstar submitted its written proposal, answered follow-up questions, and engaged in extensive negotiations with Amazon regarding the terms of the proposal. This included input and required approvals from many different departments at Amazon, including the in-house legal department, real estate, technology, finance, and top leadership. In addition, both Amazon and Northstar were represented by sophisticated outside legal counsel during the process.

59.     In late 2017, Amazon awarded Northstar a contract to construct and manage two data center shell buildings in Northern Virginia. Northstar was awarded the contract based on its proposal because, according to Amazon itself, it was the most competitive on proposed terms.

60.     Northstar had proposed and delivered on the development at a low yield on cost (under 7%), which was the lowest yield Amazon ever had for a Virginia data center. That low yield translated into savings on the rent that would be paid by Amazon tenant.

61.     Northstar was awarded the contract over as many as five other sophisticated developers who had also bid for the project, some of whom had done business with Amazon before, according to Amazon. The approval of the project involved multiple Amazon personnel, spanning several divisions and committees, and involved lengthy negotiations over the relevant contracts, development agreements, and data center leases.

## III.    Northstar Pays Referral Fees to Christian Kirschner

62.     Because Christian made the initial introduction between Northstar and Amazon—through his contact and brother, Casey—Christian and Northstar understood that he would receive referral fees for the introduction and any ongoing business from that introduction, as it had in fact resulted in business for Northstar.

63.     To arrange for the payment of those referral fees, once Northstar and Christian understood what potential fees could be derived from the new business with Amazon, Northstar and a trust set up by Christian's legal counsel, named the Villanova Trust, entered into an independent contractor agreement on January 8, 2018, governing the payment of fees related to any Amazon business Northstar obtained as a result of Christian's introduction.

64.     The agreement between Northstar and Villanova Trust detailed Christian's entitlement to the referral fees, which were a percentage of monies paid from the customary and highly negotiated fees that Northstar was to be paid from its role as the developer of the data center projects. Christian asked for the payments to be made to Villanova Trust because, according to Christian, he found it more useful to maintain more accurate track of the finances for accounting and tax issues and for estate planning reasons.

65.     Northstar insisted that the arrangement be legal and comply with any ethical and policy guidelines. Northstar requested—and was reassured by Christian and his legal counsel—that the fees paid to the Villanova Trust would benefit Christian and his immediate family only and would not benefit Christian's brother, Casey. At Christian's request and upon these continued assurances, Northstar made payments of the referral fees to Christian's company Villanova Trust from Northstar bank accounts.

66.     On economic terms, Northstar found the arrangement to be standard and in line with what it would be willing to pay for other referred business.

67.     This agreement was not a secret. In fact, Northstar used the success of Christian's arrangement to encourage others to become referral partners. All Northstar

employees knew about the referral program long before the Amazon data center projects, as Mr. Watson regularly encouraged people to participate in it. Northstar personnel involved with the Amazon projects and Northstar's business and accounting personnel had copies of the agreement as they referred to it often to calculate any potential fees payable to the Villanova Trust.

68.     Northstar had no referral agreements with Casey, Carl Nelson, or any other Amazon employee, and never paid any money to them.

## IV.   Northstar Introduces IPI to the Amazon Investment Opportunity

69.     While Northstar had the expertise to develop the data center projects at a low cost for Amazon, its business practice always involved onboarding equity investors for its projects.

70.     Northstar interviewed multiple potential capital sources to provide most of the equity required to fund the data center projects, with the remainder of the costs being funded by Northstar and its other investors and by construction debt financing that Northstar pursued and secured. In the end, Northstar selected IPI as the majority equity investor, which had formed a new $1.5 billion fund dedicated to data center acquisitions and developments. Northstar's decision to partner with IPI was also driven by the fact that IPI was not competing with Northstar in the development business but, rather, only acting as an equity provider.

71.     IPI is sponsored by real estate fund manager Iron Point Partners, LLC (the "IP" in IPI). Iron Point is an investor and partner in IPI and sources high net worth equity investors to participate in IPI, the IPI investment funds, and potentially other ventures together. The latter "I" in IPI stands for ICONIQ Capital LLC, the private family wealth management firm for Mark Zuckerberg, founder of Facebook/Meta. Iron Point and

ICONIQ controlled IPI, shared employees with IPI, and took part in some, if not all, of the meetings with federal law enforcement, discussed below. In marketing materials, ICONIQ defines its assets under management to include those of IPI, demonstrating the close relationship between the Defendants.

72.    IPI had formed an initial $1.5 billion fund to invest exclusively in data centers, then a second larger fund of $2.5 billion, and later created several even larger funds dedicated to data center projects.

73.    Northstar was introduced to IPI by Stephen Chiles of Chiles Capital. Chiles was a referral partner, like Christian. Chiles received referral fees consisting of a percentage of the equity invested by IPI for the initial introduction and would receive fees for any ongoing business or capital that IPI provided to Northstar. IPI also had its own referral partner, Adrenalin Capital, which was an entity formed by Chris Puchalla of Iron Point and which was also paid referral fees from the transactions at the direction of IPI.

74.    Both Chiles and Puchalla were paid a percentage of the amount of equity deployed in each transaction via a corporate or trust entity, like the payments to Christian, who was paid a percentage of money when a triggering event, such as an acquisition or development fee earned and received by Northstar, occurred, regardless of the size of the event or fee.

75.    Chiles traveled with Mr. Watson from Colorado to attend the initial meeting between IPI and Mr. Watson in Chicago. Chiles started the meeting by introducing himself to IPI, as they did not have a prior working relationship. This meeting occurred in the offices of IPI, which was a small, fledging startup at the time with few employees in a

small office space of cubicles. Defendants A'Hearn and Gilpin of IPI attended this meeting, along with other representatives of IPI.

76.     IPI is now one of the largest funders of data center development and acquisitions worldwide, but at the time it had neither a data center development arm nor a working relationship with Amazon/AWS, the largest user of data center space in the world. IPI would, as it turns out, learn Mr. Watson's and Northstar's development models and methods in order to effectuate its plan to steal Mr. Watson's and Northstar's intellectual property and business, including their employees, business models, and expertise. In fact, IPI commented that it had never seen parts of the deal structure that Mr. Watson was able to negotiate with Amazon that allowed Northstar—and IPI as the equity investor—to face far less risk on each deal. Upon information and belief, IPI has continued to use the deal structures that it learned from Mr. Watson and Northstar.

77.     Defendant A'Hearn submitted an offer for IPI to serve as primary equity provider for Northstar's data center deals with Amazon, which, after negotiations between the parties, Mr. Watson and Northstar accepted.

78.     On March 2, 2018, Northstar and IPI formed a limited liability company to create and manage the data center joint venture. That company was NSIPI Data Center Venture, LLC.

79.     In NSIPI Data Center Venture, LLC, IPI was to invest 95% of the equity, with Mr. Watson, Northstar affiliates, friends, and family investing the other 5% of the equity. That equity split was standard for institutional equity contributions in the industry for transactions of this magnitude. At times, however, IPI did not properly fund its committed

share, and up to 30% of the equity for projects came from Northstar's minority equity investors instead.

80.     In addition to profits on its equity contribution, Northstar entities would earn various fees for their roles in acquisition, project management, entitlement, development, asset management, leasing, and property management. This is a standard industry structure for large real estate development investment projects, and over time those fees can be a substantial source of revenue and profit, though the staff to support this work is also costly.

81.     Before entering into this arrangement, IPI conducted extensive due diligence on Northstar, as any institutional equity investor would do, which included in-person visits by IPI to Northstar in Colorado. Defendants A'Hearn, Gilpin, and other IPI employees came to Northstar's offices and met with Mr. Watson and Northstar personnel. IPI employees would make subsequent trips to Colorado as well, including a trip during which Northstar brought Gilpin to Northstar's suite to watch a Denver Broncos football game.

82.     In the course of their due diligence, IPI reviewed Northstar's other development projects, expertise, historical background, and capabilities, and learned key information about Northstar's business models, its other agreements, Mr. Watson's background, and other confidential and/or business-sensitive information.

83.     IPI also learned about Northstar's revenue on other projects, and the revenue it expected to generate going forward, both on current projects and on new potential projects.

84.     IPI constantly requested information, analysis, background, knowledge, and expertise from many of Northstar's development, accounting, investment, and real estate teams, seeking to learn as much as possible. The information requested included not only quantitative data and business plans, but even getting to know Northstar employees who IPI believed were key figures in the business.

85.     The information requested went beyond normal due diligence for an equity partner and would later prove important to IPI in taking the data center development, ownership, and management business from Northstar and building its own real estate development and management company, STACK Infrastructure.

86.     Indeed, in March 2018, around the same time it partnered with Plaintiffs, IPI acquired three Infomart data centers, including a Northern Virginia facility, and their related management company from ASB Real Estate Investments. In January 2019, IPI merged those Infomart properties with previously acquired properties to form STACK Infrastructure, based in Colorado, where Northstar and its employees were also based.

87.     Based on the information available to Plaintiffs, it is still unclear whether Defendants Gilpin, A'Hearn, and Sathe already planned to take Northstar's business when they requested this confidential information, or whether learning about Northstar's business was what inspired them to steal Northstar's Amazon contracts and relationship and expand into direct data center development, management, and ownership—a far different business than simply providing equity to sponsors such as Northstar.

**V.     The Joint Venture Yields Successful Development and Operation of Data Centers, Including Winning Contracts for Additional Data Centers with Amazon**

88.     Throughout 2018 and 2019, Northstar and IPI seemingly worked cooperatively to develop the Amazon projects. Amazon had no complaints, evidently

pleased by Mr. Watson's and the Northstar Entities' work. In fact, based on the successful development of the first two data centers, Amazon approached Northstar regarding opportunities to participate in additional data center development projects.

89.     As with the first project, bids were submitted pursuant to a competitive RFP process and final selection required approval of multiple parties, divisions, committees, and top executive leadership within Amazon and AWS, including Andy Jassy, then-SVP and CEO of AWS (and now President and CEO of Amazon).

90.     The Northstar-IPI joint venture was awarded contracts for the construction of additional data center buildings. Specifically, the joint venture won contracts to construct or develop nine planned data center buildings on three separate parcels of land. These development projects were worth over $500 million in building value alone, with an additional investment by Amazon of between $4.5 and $6.3 billion to build them out to their specifications as data centers.

91.     The Northstar-IPI joint venture completed the building of four data centers and began work on the fifth, sixth, and seventh data centers together. The total rental income per year for these data centers was in the millions of dollars. And the total value of these facilities is in the hundreds of millions of dollars.

92.     In all of these transactions, Amazon (or an affiliate) was the sole tenant who would occupy each building entirely under a long-term, 15-year, triple-net ("NNN") lease, with a corporate guarantee adding tremendous security and investment value for each building. Once a core and shell building was developed, then Amazon, as tenant, would begin paying rent, while conducting a build-out of the premises to meet their confidential specifications at a cost of $500 million to $700 million per building. Amazon told Mr.

Watson that they would receive full payback of this massive capital investment within one year from the rent it charged to house web services for the federal government and a variety of companies. This was a unique arrangement pioneered by Mr. Watson and Northstar, and IPI told Mr. Watson that they were used to seeing an owner/landlord (not the tenant) pay for such build-out costs. The arrangement IPI was familiar with would have vastly increased the amount of capital required, could potentially reduce investment returns, and caused much more risk if the tenant ever defaulted on their lease obligations or went bankrupt. The Northstar structure, and the long-term NNN lease with a corporate guarantee from Amazon, was very attractive to IPI, especially because IPI and its executives did not have a working relationship with Amazon prior to Northstar's identifying the opportunity and presenting the potential investment to IPI.

93.     To this day, Amazon continues to use and pay rent for all Northstar-built data centers. Amazon even purchased a site with four of the anticipated nine data centers at cost from IPI, with no developer or owner profit, after Mr. Watson and the Northstar Entities were wrongfully removed. Purchasing the site at cost eliminated profits both for the equity holders and for the General Partner (i.e., for Mr. Watson and the Northstar Entities) but induced Amazon to award additional development contracts to IPI, in effect trading profit where Mr. Watson and the Northstar Entities would be entitled to participate, for opportunity and profit in additional projects where all fees and profit would go to IPI. In fact, Amazon awarded IPI at least ten new development deals, and some of these were at the cost that Amazon purchased sites for years prior, even though the value of the land doubled, tripled, or quadrupled since that time. Were Mr. Watson and Northstar involved in those deals, they would most likely have been paid over $100 million, which instead

was retained by IPI, the funds it managed, STACK, and/or its partners, founders, employees, and affiliates instead.

94.     Given Northstar's successful track record, many more projects were on the horizon for Northstar. At the time Northstar was developing data centers for Amazon in Northern Virginia, the company occupied approximately 45 data centers in the area. Given the demand for internet services, and the growth of artificial intelligence, machine learning, and large language models, Amazon alone is expected to build as many as 800 new data centers. Other companies, such as Microsoft, Google, and Meta, will also need ever increasing data center development services. The growth rate for data centers is expected to triple within the next three years.

95.     IPI itself has pitched potential investors in its funds on the tremendous growth potential for the data center development industry. Per IPI's own marketing materials, Amazon is now one of its top three global relationships, and it has grown on four continents since IPI ousted Northstar. In a publicly available pitch book to the Pennsylvania State Employees Retirement System, IPI predicted that Amazon and Microsoft alone would spend $2 trillion on data centers and that the capital investment to build and fit out data centers between 2024 and 2029 alone would total $1.5 trillion.

96.     In other words, Mr. Watson's and Northstar's development of the Amazon data centers introduced IPI to the largest tenants and users in a global market that IPI itself predicted would experience exponential growth. IPI gained access to these tenants by capitalizing on the trust and access that Northstar had built with decades of acquired expertise and successes in building its corporate relationships, such as its success with Amazon's data center projects.

## VI.   IPI Recognizes the Massive Profit Opportunity of Developing the Amazon Data Centers and Undertakes Efforts to Acquire Watson's and Northstar's Interests

97.     IPI—clearly recognizing the Amazon deal to be a lucrative business opportunity identified by Northstar—then began its campaign to usurp and wrongfully oust Mr. Watson and the Northstar Entities from their partnership and their relationship with Amazon/AWS. IPI did so by capitalizing on the trust and access Northstar had developed with clients to gain a direct relationship with Amazon, the largest data center user in the entire world. IPI then also stole from Northstar the expertise that it acquired over its decades of experience with commercial real estate development projects.

98.     Having learned about the business from Mr. Watson and Northstar, IPI first tried to take over Northstar's lead role in the Amazon projects by approaching Amazon directly.

99.     Since the beginning of the relationship, IPI had frequently requested an introduction to Northstar's contacts at Amazon. It is not standard practice for an equity investor, such as IPI, to request an introduction to a developer's tenant, especially here, where Northstar and Mr. Watson identified, established, and maintained the working relationship with Amazon/AWS. Plaintiffs later discovered that Defendant A'Hearn had successfully contacted Carl Nelson, the Head of the Americas for Amazon's data center business directly, behind Mr. Watson's back, and took him to dinner in Seattle to ask him for business directly, without Northstar's consent or involvement.

100.    Second, IPI also attempted to buy Northstar's Amazon business. In the summer of 2019, IPI offered Northstar $20 million to buy out its interest in the joint venture. The buyout offer, made by Defendant A'Hearn of IPI and presented through Kyle

Ramstetter, Northstar's Director of Development, also contemplated IPI hiring several of Northstar's key employees.

101.   Mr. Watson and Northstar declined IPI's offer, which was well below any reasonable estimate of the value of even the business already in place, much less the extraordinary growth potential of the business. Mr. Watson also recognized that the data center market was set to explode and was reticent to forfeit these successful projects for the price offered. Further, IPI insisted that any deal would require that IPI hire key Northstar personnel. Even setting aside the inadequacy of the dollar figure, this demand seemed strange to Mr. Watson. Later, it would become clear to Mr. Watson that the offer was about more than the Amazon contracts under development, but about acquiring much of the expertise, relationships, knowledge, personnel, and business that Northstar had built.

102.   At the same time that it offered to buy Northstar's business, IPI also had discussions with key development staff at Northstar without Mr. Watson's knowledge or approval as part of a third effort to take over Mr. Watson's and Northstar's business. The discussions involved IPI's investment in a land deal (known as the "White Peaks" property) that Northstar employees Kyle Ramstetter and Will Camenson usurped from Northstar, without its knowledge. IPI had discussions with Ramstetter and Camenson to pursue this transaction with Amazon directly, without Northstar, even though it knew that Messrs. Ramstetter and Camenson were full-time employees of Northstar. IPI knew or should have known that Ramstetter and Camenson were obligated to present the White Peaks opportunity to Northstar rather than to Amazon directly in their own and IPI's

(investor) interests, especially when IPI was already an investor with Northstar, their employer.

103.   Ultimately, Ramstetter and Camenson purchased the land from the seller of the White Peaks property for $98 million, and then sold that property to Amazon on the same day for $116 million, making $18 million of profit for themselves. The seller of this land was the same seller of the first Northstar data center land development site for Amazon, and it was through their work for Northstar that Ramstetter and Camenson met the seller and subsequently placed the White Peaks site under contract and then sold it to Northstar's business relationship and tenant, Amazon/AWS.

104.   After Mr. Watson terminated Ramstetter and Camenson in October 2019 for taking from Northstar the opportunity provided by the White Peaks deal, Mr. Watson asked Tim Lorman, Northstar's Chief Operating Officer, Brent Gray, its Chief Financial Officer, and others to work on the Amazon account, while new replacement development personnel were hired.

105.   During this time of transition, IPI manufactured pretextual complaints and issues not to pay amounts owed to the Northstar Entities in a fourth effort to "take over" the deals by yet another method after their prior plans failed. IPI's complaints had no basis in fact and IPI never provided any required formal notice (with a corresponding right to cure) to the Northstar Entities per the terms of the joint venture. Rather, it was an attempt to place additional strong-arm, mafia-like pressure on Northstar to create a divide between Northstar, its employees, and its tenant, Amazon/AWS. Ultimately, none of these supposed "issues" were based in reality, let alone material, and IPI had to look for yet another way to remove Mr. Watson and Northstar.

**VII.** **When IPI's Prior Schemes Failed, Defendants Gilpin, A'Hearn, Sathe and others at IPI Concoct a Scheme to Steal Watson's and Northstar's Business**

106.    Despite its prior failures, IPI had not given up on taking the relationship and business from Mr. Watson and Northstar, as it clearly recognized the future of potential real estate developments and ownership as opposed to passive equity investment. Mr. Watson and Northstar's share of the completed projects was already worth $73 million, with expected near-term gains projected in the millions as well.

107.    In fact, in 2019, IPI merged and restructured properties it had to form STACK Infrastructure, based in Denver, in part to replace the Northstar Entities in the data center development and management business. Pursuant to this fifth approach, IPI aggressively sought an opportunity to seize future projects for themselves and investors in the IPI funds by cutting out Mr. Watson and Northstar as the middleman. Had IPI disclosed its plan to enter the development business to Mr. Watson, he would not have selected IPI as Northstar's majority equity partner given the control such a large equity partner has, including withholding earned payments.

108.    IPI concluded that it would be able to permanently remove Mr. Watson were it to try and secure a felony conviction of him, or at least an embarrassing and debilitating investigation, by the federal government, as this was the only way they could remove Mr. Watson, as the assets were doing so well financially. IPI did not care if doing so would destroy Mr. Watson personally and professionally if that was what it would take to finally get ahold of his data center business and industry relationships.

109.    This sixth and final scheme involved manufacturing, initiating, and continuously lobbying for a baseless government investigation of Mr. Watson in order to terminate the joint venture and keep Mr. Watson and Northstar sidelined while IPI

entrenched itself in the industry. To do this, IPI first selected a legal team headed by the former chief of the Financial Crimes and Public Corruption Unit in the U.S. Attorney's Office in the Eastern District of Virginia, rather than a finance, business, or real estate litigator. IPI used that lawyer's, and his large law firm's, relationships and reputation to lobby the DOJ to open an investigation of Mr. Watson based on false and incomplete testimony from witnesses that IPI itself coached and coerced. After nearly five years of intense lobbying by IPI, and having spent untold time and taxpayer dollars based on IPI's lies, the DOJ has dropped the investigation. But in the meantime, IPI's false accusations gave it the opportunity to terminate the joint venture, take over Mr. Watson's and Northstar's business, and make immense fees and profits for itself and its investors.

110.   In November 2019, and then again in December 2019, after leaving Northstar on good terms months earlier, Daniel C. Mulcahy, a former Northstar employee, sent an email to Amazon Founder and then-CEO Jeff Bezos to report his concerns regarding purported improper activity as it related to Northstar's referral fees. Mulcahy was not motivated by altruism. Rather, Mulcahy's e-mail requested either cash compensation or a well-paid job at Amazon in exchange for information.[2] Based on the timeline, it appears that IPI also received Mulcahy's false allegations.

111.   Whether or not IPI received Mulcahy's emails or encouraged him to send them, shortly thereafter IPI was in contact with Northstar's then-Chief Operating Officer, Timothy Lorman, extracting information from him that it could twist into accusations of impropriety against Mr. Watson and Northstar. In January 2020, Lorman told IPI that he

---

[2] Mr. Watson has a pending lawsuit against Mulcahy in this District. *Watson v. Mulcahy*, No. 24-cv-2606 (D. Colo.).

had surreptitiously (and wrongfully) gathered internal Northstar documents and communications, including documents related to fees paid to Villanova Trust, and presented them to IPI. Lorman himself later acknowledged that at the time he had no reason to believe Mr. Watson or Northstar had done anything illegal in connection with the payments to Villanova Trust, but IPI was able to use the material Lorman had gathered to put its own unsupported spin on the facts when approaching the DOJ. Lorman continued to collect documents at IPI's direction and, though he was a full-time employee of Northstar with fiduciary and confidentiality responsibilities to Northstar, secretively collaborated with IPI until at least April 2020 by email, telephone, and in-person meetings. Based on the record, it appears Lorman may have continued providing material to IPI after April 2, 2020, as well. This was a critical time period in IPI's scheme, and Lorman's wrongful collaboration with IPI was important in providing IPI the false and incomplete allegations it would use against Mr. Watson and Northstar.

112.    Given Lorman's deep knowledge of the business and the referral partner relationship, Lorman knew that Mr. Watson had received assurances that the referral fee would only go to Christian. If Lorman had genuine concerns, he could have raised the issue with Mr. Watson and/or Northstar's legal counsel. In fact, Lorman had previously asked Mr. Watson about the referral agreement, and Mr. Watson was open about it, pointing out that Northstar's legal counsel had reviewed and approved the arrangement, and told Lorman that he was welcome to speak with Northstar's counsel about it at any time. Apparently, Lorman never did so. Lorman's decision to go behind Mr. Watson's back and work with IPI at their direction demonstrates that IPI was a driving force behind his actions.

113.    IPI used Lorman to create a pretext to remove the Northstar Entities from the joint venture and pocket millions of dollars otherwise owed to the Northstar Entities and Mr. Watson. It also used Lorman to stall payments of approximately $3.7 million in fees to the Northstar Entities that had been earned and that had been due for months, which IPI later paid to themselves in full, provided for in a written amendment IPI signed the very day that the coordinated FBI raid on Watson's home occurred under IPI's pressure.

114.    As part of its plan to steal Mr. Watson and Northstar's business, IPI took Lorman's disclosure of the referral partner arrangement and Villanova Trust agreement and framed it to serve its own purpose of accusing Mr. Watson of a crime and removing him and the Northstar Entities from the joint venture. Like Lorman, IPI also proceeded to act on its accusations against Mr. Watson without speaking with Mr. Watson, its partner and the Manager in the joint venture, to learn the facts. Had it done so, IPI would have had no basis to approach the DOJ and would have also had to tell Mr. Watson's side of the story—which it did not want to do.

115.    Instead, IPI went to work twisting Lorman's information into a false story to dupe the U.S. Attorney into pursuing Mr. Watson. In January 2020, IPI met with Lorman in Chicago to press him for inside information on Mr. Watson and Northstar, which it planned to use to against them. Specifically, IPI spun Lorman's information regarding Northstar's referral arrangement with Villanova Trust into allegations of an illegal "kickback" scheme to induce the DOJ to investigate Mr. Watson and Northstar, even though referral fees were standard in the industry. In fact, Lorman later admitted that during his time collaborating with IPI, he never had any reason to believe that the

payments to Villanova Trust were other than what was laid out in the Villanova Trust agreement, that he had not used IPI's preferred term, "kickback," at least until after he resigned on April 7, 2020, and that any such knowledge or belief came from reading court filings—filings that were derived from IPI's own false and incomplete allegations. In fact, IPI and/or its legal counsel prepared written testimony for Lorman used in IPI's campaign against Mr. Watson, and Lorman later admitted that many of the statements in that written testimony were not based on Lorman's personal knowledge.

116.    IPI also flew former Northstar employee Kyle Ramstetter to Chicago at least 10 times, according to Ramstetter, to pressure him to concoct false allegations against Mr. Watson and Northstar. IPI also sought to distance Ramstetter and Camenson from Mr. Watson to secure their development expertise and talents to service the Amazon relationship for IPI directly and offered Ramstetter—and likely Camenson—lucrative compensation and positions in exchange for trying to encourage their buyout of Mr. Watson and Northstar and for offering harmful testimony against Mr. Watson.

117.    Ramstetter later admitted his acquiescence in IPI's pressure campaign in a recorded telephone call in February 2024, which became public in August 2024. He explained that IPI was a driving force, that was trying to "undo" Mr. Watson:

> I have been flown to Chicago ten times and I can tell you what that means. From IPI . . . I can tell you when and where, the dates, the plane tickets, *I can tell you how they were trying to undo Brian [Watson] before all this shit*. . . .

118.    When asked if IPI was behind these efforts, he confirmed, responding: "A thousand … a thousand f*cking percent." Ramstetter went on to explain that IPI was, from the start, a driving force behind the campaign against Mr. Watson personally:

I mean I don't know the basis of it but I can tell you how it all started. And the vendetta of a billion dollar Mark Zuckerberg fund, **that was out to get Brian [Watson]**. . . .

119. Ramstetter also explained that IPI offered him financial rewards for helping remove Mr. Watson:

Now, if somebody put me on the stand and said "**Did somebody want to pay you x millions of dollars to come work for them and to take over this Amazon relationship if x, and y, and z happened**" I would say "yes and here's how it happened." . . .

120. Ramstetter went on to explain that he was also being threatened, had been told what to testify to, and suggested what he had been told to testify to was not accurate:

So I'm in depositions, national attorneys, like, **I'm being told what to say. … I'm just being threatened with f\*cking everything, with every component of my life**…. I didn't know what to do.

…

Yeah, it was, reason I say talk is, you know, from a quote-unquote "cooperating person" **being told something else before depositions** and everything, it's like, **I don't think this is right**.

121. The threats were serious enough that Ramstetter said he needed protection, presumably from IPI's mafia-like threats:

**I need to be protected** by somebody who knows what they're doing…

122. The enterprise was not a single isolated occurrence. According to Ramstetter, he was involved for at least a year and a half:

I can give you the dates and times and conversations eighteen months before that. . . .

123. According to Ramstetter, he, and likely IPI, was also coordinating with Mulcahy:

> I have texts and emails from Danny [Mulcahy] at Northstar explaining what he's doing.

124.    IPI knew or recklessly disregarded that these allegations were false and/or incomplete, by virtue of their involvement in the joint venture from the start and by their due diligence process, during which no aspect of Northstar's referral program was hidden. This knowledge is further evidenced by their deliberate failure to raise the issue with Mr. Watson before approaching Amazon and the DOJ.

## VIII.   Defendants IPI, A'Hearn, and Gilpin approach the DOJ with the false allegations from Lorman and Ramstetter

125.    On or shortly before February 11, 2020, IPI secured a meeting with federal prosecutors for the Eastern District of Virginia to present their allegations against Mr. Watson.

126.    On February 19, 2020, with the DOJ meeting set for the following morning, IPI and Amazon executed an explicit, written agreement to remove Mr. Watson and the Northstar Entities without Mr. Watson's knowledge or affording him his contractual right to cure any purported breach. IPI kept this agreement secret from Mr. Watson, while Mr. Watson continued to direct construction and development of properties and manage the investments and while he was the only person who personally guaranteed the hundreds of millions of dollars of construction debt for the projects. Instead of undertaking its own good-faith internal investigation, IPI proceeded to push the DOJ based on the allegations it had coerced from witnesses under pressure.

127.    On February 20, 2020, representatives for IPI—including Nitin Sathe, who serves as General Counsel for IPI as well as General Counsel and Chief Compliance officer for Iron Point—met with the DOJ to ask for (based on its manipulated and false

story) an investigation and indictment of Mr. Watson, as it wanted a pretext to remove Mr. Watson from the joint venture.

128.    Relying on the allegations that IPI knew were false, incomplete, and made as a result of IPI's own coercion, IPI participated in and/or made several presentations to the U.S. Attorney's Office for the Eastern District of Virginia to convince prosecutors to pursue Mr. Watson with criminal charges.

129.    These presentations were made on or around at least two dates: February 20, 2020, and September 30, 2020.

130.    IPI also engaged in over fifty other meetings and phone calls to pressure the U.S. Attorney's Office for the Eastern District of Virginia to pursue Mr. Watson.

131.    According to Ramstetter, this process went on for at least 18 months.

132.    IPI's meetings with the DOJ, Northstar's employees, and witnesses whose testimony it sought to fabricate took place in Colorado, Virginia, Illinois, and possibly Washington state.

## IX.    Instigated by IPI, the DOJ pursues Watson, Northstar, and several Amazon employees

133.    A key point in Defendants' scheme came on April 2, 2020, when the FBI executed a search warrant on Mr. Watson's Colorado home and when IPI, within hours, terminated Mr. Watson and the Northstar Entities from the joint venture.

134.    The FBI's raid involved seizing property belonging to Mr. Watson and Northstar. The FBI took Mr. Watson's only cell phone and his two laptop computers, which were the only communications devices connecting Mr. Watson to the outside world. This was particularly disturbing and damaging given it was the beginning of the COVID-19 pandemic with home quarantine mandates taking effect, and Mr. Watson had been

stripped of his main means of contact to run his other projects and communicate with his employees.

135.    The FBI also questioned Mr. Watson regarding Northstar's payments to Villanova Trust in connection with the joint venture. The agents indicated to Mr. Watson that he was under criminal investigation and to expect an indictment in the near future (which never materialized).

136.    Mr. Watson used his wife's cell phone to call Lorman, his trusted Chief Operating Officer at Northstar, and told him about the FBI raid immediately after the FBI agents had left.

137.    Within hours, Mr. Watson received a removal notice and termination letters as to the Northstar Entities from IPI through Lorman. IPI did not ask Mr. Watson about the investigation or ask to speak about the basis of the investigation or FBI raid, which any other business partner would have done upon learning of such an investigation for the first time. Instead, the removal notice and termination letters appeared to have been prepared well in advance, which in retrospect is unsurprising, since it later became clear that IPI had manufactured, instigated, and intensely lobbied for the entire investigation and had already executed paperwork setting into motion Mr. Watson's termination as early as February 19, 2020. In any event, Northstar and Mr. Watson were hamstrung: they could not fight nor respond to the removal notice and termination letters because of the pending criminal investigation about which they had just learned.

138.    The fallout from the FBI's raid and the DOJ's investigation was not limited to the (already extraordinary) loss of the Amazon deals. Rather, Mr. Watson and Northstar were removed from almost all of their other unrelated investments due to the government

investigation, causing the loss of many millions of dollars and the eventual destruction of Northstar. Mr. Watson's name, company, reputation, and assets were destroyed by the federal investigation and the subsequent negative media bombardment, which repeated IPI's false allegations. According to the Denver Business Journal, Mr. Watson's demise was the top 3 business story in Denver in 2020, behind only the U.S. presidential election and the COVID-19 pandemic.

139.   In addition to long-term reputational and financial harm, IPI's scheme caused immediate financial harm to Mr. Watson and Northstar. Prior to the coordinated FBI raid on Mr. Watson's home in April 2020, IPI and the investment partnership owed the Northstar Entities approximately $3.7 million in earned development fees that were due several months prior. In early 2020, Mr. Watson had pleaded with IPI to approve the payments, which were overdue. Leading up to the raid, IPI kept delaying approval of the payments, using Lorman to do so, as Mr. Watson had asked Lorman to lead the discussions with IPI surrounding outstanding payments.

140.   Upon information and belief, prior to the FBI raid, IPI most likely acted to have all of the fees, with no discount, paid to it directly, even though they had not earned those fees, as they finalized a written amendment the day of the raid to have all these fees paid to themselves. Because IPI withheld $3.7 million in fees earned and due, Northstar and Mr. Watson defaulted on loans and payment obligations and could not pay their office space rent, which led to a lawsuit by that landlord against Northstar. Northstar was forced to let almost all of its 40 employees go, which eliminated Mr. Watson's and Northstar's ability to work on its other investments, pursue new opportunities, and earn fees for its work. This also prevented Mr. Watson and Northstar from pursuing other data

center or investment projects at a time that market became extremely profitable. All of this was extremely stressful for Mr. Watson as the sole owner of Northstar, which led to him almost taking his own life due to the actions of IPI, its founders, employees, and partners/affiliates.

141.   IPI also did not let its scheme interrupt its own development plans, relying on Mr. Watson's experience and credit to personally guarantee data center construction loans and additional bank funding, without disclosing its in-process scheme against Mr. Watson and Northstar.

142.   Leading up to the FBI raid, IPI knew that its campaign to manipulate the DOJ was bearing fruit and that the raid was only a matter of time. In the months before the raid, IPI worked aggressively to obtain a critical construction loan draw near the end of March 2020, knowing the FBI raid on Mr. Watson's home was imminent. Upon information and belief, it appears IPI either timed the loan funding around the FBI's raid or had a role in setting the date of the FBI raid, as the raid occurred soon after the loan draw funds were received. Upon information and belief, IPI did not disclose to the lender their manufactured claims of illegal conduct by Mr. Watson, their false allegations presented to the DOJ, or their already-in-motion plans to terminate Mr. Watson and the Northstar Entities from the joint venture, including the written agreement they executed with Amazon in February 2020 to remove Mr. Watson and Northstar without the latter's knowledge. IPI would have been obligated to disclose their allegations against Mr. Watson to the lender, had they genuinely believed them, but doing so would have certainly jeopardized their ability to secure the loan draw. Indeed, no conservative major banking institution would take on such exposure.

143.    Instead, IPI did, in fact, receive the funding, which was part of Mr. Watson's personal guaranty for the loan, knowing that it planned to provide a termination notice to Mr. Watson shortly after the loan was secured and funded and the FBI conducted its raid, even though IPI had already terminated Mr. Watson and Northstar without their knowledge or their right to cure.

144.    Mr. Watson and the Northstar Entities were wrongfully terminated and deprived of fees and profits from the Amazon data center deals in an amount exceeding $73 million.[3] Prior to the termination, Mr. Watson and the Northstar Entities had secured nine contracts to develop data centers for Amazon during an approximate 18-month period. On that trajectory, and with Amazon's reasonably foreseeable growth rate and tremendous need for data centers that is reflected in its actual transactions during the past few years, Mr. Watson and the Northstar Entities could have secured another 45 to 100, or more, data center projects for Amazon. The value of those projects was tremendous, generating anywhere from $365 to $800 million in fees and profits for the Northstar Entities and Mr. Watson.

145.    On May 7, 2020, IPI executed a below-market buyout of the minority investors who had participated in the Amazon deals, without any prior notice to Mr. Watson, the minority investors, or the Northstar Entities. The very moment that the nonconsensual buyout funds hit the Northstar Entities' investment entity bank accounts,

---

[3] Northstar and Northstar subsidiaries have a pending lawsuit against the parties to and for causes of action stemming from the NSIPI Data Center Venture, LLC Limited Liability Company Agreement, and breach thereof, in Delaware state court. *W.D.C. Holdings, LLC d/b/a Northstar Commercial Partners et al. v. IPI Partners, LLC et al.*, C.A. No. 20201-1026-JTL (Del. Ch. 2020). Mr. Watson is not a party to that lawsuit, which was filed before Defendants' scheme came to light.

they were seized through civil forfeiture proceedings, which would have required coordination between IPI, its managers, and federal law enforcement. The federal government held these funds for almost two and a half years and finally released all of the money to the other investors without interest, on one condition: that Mr. Watson would not receive any of his rightful share of the funds. This forfeiture and wrongful refusal to return funds to Mr. Watson hampered his legal defense and investigation, as well as the operation of his companies and estate, causing further fallout for Mr. Watson and the Northstar. Upon information and belief, IPI recommended that the DOJ withhold the proper payment of Mr. Watson's share of these funds, in an effort to further debilitate and hamstring Mr. Watson from both legally defending himself and pursuing IPI for the damage their scheme had caused him.

146.   In addition, Mr. Watson and Northstar were forced to resign from their largest portfolio of 18 national assets, and Mr. Watson was forced to resign as a manager of multiple investments and investment funds.

147.   Northstar also could not pursue its planned and in-progress business. For example, it had to discontinue its efforts to launch a new $500 million data center land investment fund. Northstar also lost the opportunity to buy two iconic office buildings in Denver and Houston, as well as other assets in various markets, when news of the FBI raid broke.

148.   Northstar and Mr. Watson suffered a loss of credit, damage to their reputations, given the extremely negative news coverage and their inability to meet payment obligations, and emotional distress. In fact, Mr. Watson contemplated suicide in April 2020 and subsequently sought counseling and therapy.

149.   Mr. Watson and Northstar also incurred significant attorneys' fees associated with defending against Amazon's lawsuit and other litigation related to IPI's carefully orchestrated campaign.

150.   After years of investigation, the U.S. Attorney's Office for the Eastern District of Virginia found no wrongdoing by the Northstar Entities or Mr. Watson. Indeed, Mr. Watson cooperated in the Office's investigation. In over 30 hours in four depositions in multiple cases, Mr. Watson never pled the Fifth Amendment to any question and substantively answered all questions to the best of his ability, both in his individual capacity and as the corporate representative of Northstar.

151.   The DOJ has not brought any criminal charges against Mr. Watson or Northstar and has told Mr. Watson that none will be brought and that the case is closed from their perspective.

152.   In a practically unprecedented step, the DOJ moved to vacate guilty pleas that it had obtained from other witnesses who were pressured, coached, and/or coerced by IPI and the other Defendants to provide testimony against Mr. Watson.

153.   In the civil case, the plaintiff's lawyers had to withdraw multiple sworn affidavits they had filed and on which it had relied. These affidavits were filed in support of motions to seize Mr. Watson's assets and appoint a receiver, which hamstrung Mr. Watson's ability to defend against IPI's scheme. The withdrawal of the false affidavits came soon after a receiver was appointed, and the receivership remained in place. After 926 days, the Receiver was finally removed in May 2024, giving Mr. Watson back control of his interests, at which point almost all of Northstar's recurring fee income had been lost or given away, and most of his assets had been sold at vast discounts to their values or

lost in loan defaults and/or bankruptcy proceedings, even though Mr. Watson still has not had his fair day in court.

154. After years of litigation, likely tens of millions of dollars spent, millions of pages of documents exchanged, and dozens of depositions, the court in the Eastern District of Virginia dismissed nearly all of the civil claims against Mr. Watson and Northstar, granting summary judgment in favor of Mr. Watson in March 2023 on all claims except one state law claim. Amazon's own expert opinion report acknowledges it suffered no financial damages. Indeed, apparently Amazon ratified the exact same terms it made with Northstar after IPI wrongfully terminated the relationship.

155. In the civil case, discovery was covered by a strict protective order, keeping nearly all documents confidential and hidden from public view. IPI was not a party in that litigation, but did respond to third-party discovery demands. IPI had an interest in relying on the protective order, as its productions, too, were subject to the order. And a significant portion of the materials were kept hidden even from Mr. Watson, under an "attorneys'-eyes-only" designation. IPI has regularly referred to itself as a "disinterested third party" in the Amazon litigation, despite being a driving force behind Amazon's inquiry in the first place.

156. IPI has thus intentionally hidden the facts of its scheme from the public and many of the facts from Mr. Watson himself. Mr. Watson's investigation is ongoing, and Plaintiffs will amend this complaint to reflect additional facts that are revealed when materials currently sealed under the strict protective order become public.

**COUNT I**

**Violations of the Racketeer Influenced and Corrupt Organizations Act (RICO),
18 U.S.C.A. §§ 1962(b) and (c)**

**(Against Defendants IPI, Iron Point, ICONIQ, STACK,
A'Hearn, Gilpin, and Sathe (the "RICO Defendants"))**

157.    Plaintiffs repeat, reallege, and reincorporate by reference the allegations set forth above as if fully set forth herein.

158.    At all relevant times, the RICO Defendants were "persons" within the meaning of 18 U.S.C. § 1961(3).

159.    Defendant IPI is a legal entity as a limited liability company, of which Iron Point and ICONIQ were and are investors and partners and A'Hearn and Gilpin were and are members at all relevant times, and constituted an enterprise that engaged in, or the activities of which affected, interstate commerce.

160.    Alternatively or additionally, the joint venture of Defendants IPI and STACK Infrastructure constituted an enterprise that engaged in, or the activities of which affected, interstate commerce.

161.    Alternatively or additionally, the joint venture between IPI and Northstar, NSIPI Data Center Venture, LLC, constituted an enterprise that engaged in, or the activities of which affected, interstate commerce.

162.    Alternatively or additionally, the RICO Defendants along with other individuals, formed an associated-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) that engaged in, or the activities of which affected, interstate or foreign commerce. Specifically, the RICO Defendants, along with nonparties Timothy Lorman, Kyle Ramstetter, Daniel Mulcahy, and Will Camenson, associated together for the common purpose of stealing Watson and Northstar's business plans, relationships, and

industry expertise, which they eventually did by committing the RICO predicate acts outlined below.

163.     The relationships and contacts among the RICO Defendants and nonparties Lorman and Ramstetter are extensive. They had regular meetings, telephone conversations, and other electronic communications across state lines with each other for the purpose of stealing Plaintiffs' business using illegal acts.

164.     This association-in-fact enterprise existed among the RICO Defendants and nonparties Lorman, Ramstetter, Mulcahy and Camenson from no later than the summer of 2019 until at least 2024. In fact, it appears likely that the enterprise began as to at least the RICO Defendants as early as 2018, when defendants Gilpin and A'Hearn visited Colorado and requested confidential and proprietary information on Northstar's real estate investments, including introductions to key employees, which went beyond the scope of ordinary due diligence in connection with the Amazon joint venture.

165.     The RICO Defendants conducted the affairs of an enterprise and/or the association-in-fact enterprise. Specifically, each of the RICO Defendants participated in its operation or management, directly or indirectly, and did more than simply provide services to the enterprise. For example, and without purporting to be an exhaustive recitation of the RICO Defendants' conduct of the enterprise, Defendants A'Hearn and Gilpin directed the activities of Lorman and Ramstetter and were responsible for the strategy implemented by the enterprise to obtain Plaintiffs' business, including the prior failed plans to, for example, buy out Watson and Northstar or to approach Amazon directly. Similarly, IPI, Iron Point, ICONIQ and STACK each were responsible for the

ultimate decision-making of the enterprise and provided direction to or control of the enterprise.

166.    Each of the RICO Defendants acted to ultimately further the goal of the enterprise to, *inter alia*, remove Plaintiffs from their economic positions and wrest away from them any future economic opportunities in the data center development industry, namely:

- Campaigning for former Northstar personnel to falsely testify against Plaintiffs to federal authorities for a period of at least 18 months;

- Flying former Northstar personnel to Chicago, where IPI is based, to pressure them to give false testimonies against Plaintiffs to federal authorities; and

- Promising to reward to at least one former Northstar employee if he agreed to falsely implicate Plaintiffs for involvement in an alleged "kickback" scheme to federal authorities.

167.    The RICO Defendants engaged in numerous acts of racketeering activity as contemplated by the statute, including in the conduct of the enterprise, such as:

a. Witness tampering (18 U.S.C. § 1512(b) and (c)) and Conspiring to Witness Tamper (18 U.S.C. § 1512(k)): The RICO Defendants, among other things, knowing or recklessly disregarding the false and incomplete nature of the testimony they sought to have persons provide to the DOJ and with the intent that those persons provide the testimony so that the RICO Defendants could use any resulting investigation or process to steal Plaintiffs' business, corruptly persuaded, or engaged in misleading conduct toward, those persons so that those persons would provide testimony to the DOJ and at any other official proceedings to influence the DOJ to institute an investigation and process against Plaintiffs. Among other acts, the RICO Defendants in January 2020 hosted Lorman in Chicago to extract information from him regarding Northstar's referral arrangement to twist into accusations of impropriety against Plaintiffs

for practices that were standard in the industry and that Lorman later testified he did not think were improper.

b.  In addition, IPI also flew Kyle Ramstetter, a former Northstar employee, to Chicago multiple times to pressure him to concoct false allegations against Mr. Watson and Northstar. As Kyle Ramstetter himself has stated, IPI's campaign of pressure occurred for at least 18 months and Ramstetter can provide specific dates and times of those conversations. Moreover, even if the testimony was not yet completed, the RICO Defendants agreed to influence the testimony of these persons and took steps to do so such that had those persons testified, the RICO Defendants would be guilty of offenses outlined under 18 U.S.C. § 1512;

c.  Bribery of witnesses (18 U.S.C. § 201): The RICO Defendants offered compensation to persons to influence their testimony or other statements made under oath or affirmation. Specifically, the RICO Defendants offered Ramstetter value in exchange for his statements, as Ramstetter admitted on his phone call, stating, "Now, if somebody put me on the stand and said 'Did somebody want to pay you x millions of dollars to come work for them and to take over this Amazon relationship if x, and y, and z happened' I would say 'yes and here's how it happened.'" The timeline suggests that the RICO Defendants might have offered similar compensation or value to other persons;

d.  Multiple instances of mail and wire fraud (18 U.S.C. §§ 1341, 1343): The RICO Defendants, acting with the intent to defraud the DOJ and other stakeholders, engaged in a scheme to obtain false or misleading statements and testimony from persons to supply to the DOJ and those stakeholders, and in doing so used the mails or wires to effectuate that scheme. Examples of false statements that the RICO Defendants obtained or procured from persons include, but are not limited to, false statements to the DOJ concerning Plaintiffs' involvement or knowledge of improper payments or kickbacks to Amazon employees, when the payments were to the Amazon employee's brother and that brother's trust fund, which upon information and belief, were provided to the DOJ on at least two dates, February 20, 2020 and September 30, 2020, with at least 50 more meetings, calls or communications with the DOJ; further false statements to Amazon to defraud Amazon into removing Plaintiffs from deals with them and that Amazon might then transmit to the DOJ during presentations on the same dates stated above; further material omissions or misleading statements include the withholding of key facts—that the RICO Defendants knew—that would make the statements provided to the DOJ or other stakeholders not misleading, such as withholding that Plaintiffs had not made any

payments to Amazon employees, that the RICO Defendants had not asked Plaintiffs about the payments, that the arrangement had been reviewed and approved by outside counsel, and that the RICO Defendants were interested in obtaining Plaintiffs' business;

e.  Engaging in monetary transactions resulting from specified unlawful activity (18 U.S.C. § 1957): The RICO Defendants, acting in the jurisdiction of the United States, knowingly engaged in monetary transactions in property derived from "specified unlawful activity" of a value greater than $10,000 by engaging in the predicate acts, obtaining control over Plaintiffs' property or business and then engaging in transactions with that property or business; and

f.  Travel Act (18 U.S.C. § 1952): the RICO Defendants travelled in interstate or foreign commerce to distribute the proceeds of unlawful activity and to promote, manage, establish, carry on, or to facilitate the promotion, management, establishment or carrying on, of unlawful activity and thereafter did perform or attempted to perform such acts. Specifically, the RICO Defendants often travelled in interstate or foreign commerce after committing the violations of 18 U.S.C. § 1957, above, with the intent to distribute the proceeds derived from those violations or to promote, manage, establish, carry on, or to facilitate the promotion, management, establishment or carrying on, of those violations.

168.   Moreover, these predicate acts constituted a pattern of racketeering activity that extended over a term of years. They were all acts tied to each other by common persons committing those acts (the RICO Defendants), common victims (the Plaintiffs), and a common purpose (to illegally fabricate a criminal investigation of Plaintiffs and wrest control of the Amazon data center projects away from Plaintiffs).

169.   The RICO Defendants participated in the scheme knowingly, willfully, and with the specific intent to wrest control of Plaintiffs' data center development business from Plaintiffs to the RICO Defendants' benefit. By reason of the violations of 18 U.S.C. § 1962(c) committed by the RICO Defendants, Plaintiffs have been injured within the meaning of 18 U.S.C. § 1964(c) in an amount to be proven at trial.

170.     The RICO Defendants also violated 18 U.S.C. § 1962(b) through the same pattern of racketeering activity outlined above. The RICO Defendants, through that pattern of racketeering activity, intended to and obtained further interests in an enterprise—the joint venture between Northstar and IPI. By acquiring such control through a pattern of racketeering activity, the RICO Defendants effectively removed Plaintiffs from their rightful positions as minority owners and managers of the joint venture. In other words, but for and by reason of the RICO Defendants' predicate acts of racketeering activity to obtain control over the joint venture, Plaintiffs were injured in their business or property.

171.     By reason of the violations of 18 U.S.C. § 1962(b) and (c) committed by the RICO Defendants, Plaintiffs were injured in their business or property, and Plaintiffs are entitled to treble damages pursuant to 18 U.S.C. § 1964(c), with interest from the date of loss, plus costs and reasonable attorneys' fees.

## COUNT II

**Violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. § 1962(d)**

**(Against the RICO Defendants)**

172.     Plaintiffs repeat, reallege, and reincorporate by reference the allegations set forth above as if fully set forth herein.

173.     The RICO Defendants unlawfully, knowingly, and willfully combined, conspired, and agreed with each other and others to conduct the affairs of an enterprise through a pattern of racketeering activity or to obtain or to maintain control of an enterprise through a pattern of racketeering activity. These acts would, if completed, constitute violations § 1962(b) and (c) in contravention of 18 U.S.C. § 1962(d).

174.    The RICO Defendants agreed with each other to commit those acts knowing the essential character of the scheme. The RICO Defendants knew that the predicate acts were in furtherance of the scheme and participated in, and agreed to the commission of, those acts in furtherance of the scheme.

175.    By reason of the violations of 18 U.S.C. § 1962(d) committed by the RICO Defendants, Plaintiffs are entitled to treble damages pursuant to 18 U.S.C. § 1964(c), with interest from the date of loss, plus costs and reasonable attorneys' fees.

## COUNT III

### Violation of the Colorado Organized Crime Control Act (COCCA)

### (Colo. Rev. Stat. §§ 18-17-101 – 18-17-109)

### (Against the RICO Defendants)

176.    Plaintiffs repeat, reallege, and reincorporate by reference the allegations set forth above as if fully set forth herein.

177.    At all relevant times, the RICO Defendants were "persons" within the meaning of Colo. Rev. Stat. § 18-17-103(4).

178.    As alleged herein, the RICO Defendants concocted, orchestrated, and directed the fraudulent and illicit scheme to create a pretext for Plaintiffs' termination from the joint venture and obtain exclusive control of the Amazon data center development projects through a "pattern of racketeering activity" as defined in Colo. Rev. Stat. §§ 18-17-103(3), 18-17-103(5), including manufacturing knowingly false testimony of an alleged kickback scheme between Plaintiffs and an employee of Amazon to induce the DOJ to launch a criminal investigation into Plaintiffs.

179.    The RICO Defendants' conduct constitutes racketeering activity under Colo. Rev. Stat. § 18-17-103(5)(b)(II) because such acts permitted the RICO Defendants to

obtain Plaintiffs' share in the joint venture by false pretense and misrepresentation with the intent to permanently deprive Plaintiffs of their share in the parties' joint venture, and future data center development business, thereby constituting theft in violation of Colo. Rev. Stat. § 18-4-401.

180.    The RICO Defendants' predicate acts were interrelated, not isolated, and were perpetrated for the same or similar purpose: to permanently deprive Plaintiffs of their share in the parties' joint venture, as well as future data center development and ownership business.

181.    These predicate acts were performed by the RICO Defendants and conducted for the purpose of using subterfuge, deceit, misinformation, and dishonest means to acquire Plaintiffs' share in the joint venture, including:

- Campaigning for former Northstar personnel to falsely testify against Plaintiffs to federal authorities for a period of at least 18 months;

- Flying Northstar personnel to Chicago, where IPI is based, to pressure them to give false testimonies against Plaintiffs to federal authorities; and

- Promising to reward at least one former Northstar employee if he agreed to falsely implicate Plaintiffs for involvement in a kickback scheme to federal authorities.

182.    Defendants' activities occurred in Colorado within the last five years, including contacting Colorado-based witnesses, such as Lorman and Ramstetter, and tampering with their testimony, meeting with Plaintiffs in Colorado as part of their scheme, usurping the business of Colorado persons and entities, and restructuring prior

acquisitions to form the Colorado-based entity, STACK Infrastructure, from previously acquired properties to take over Plaintiffs' business.

183. As a direct and proximate result of the conspiracy, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial and are entitled to such compensatory damages caused by the violations of COCCA, plus treble damages, interest, attorneys' fees, a right or claim to the business stolen from Plaintiffs by Defendants and to the proceeds derived therefrom, and costs pursuant to Colo. Rev. Stat. § 18-17-106(7).

## COUNT IV

### Civil Conspiracy

### (Against Defendants IPI, A'Hearn, Gilpin, and Sathe)

184. Plaintiffs repeat, reallege, and reincorporate by reference the allegations set forth above as if fully set forth herein.

185. Defendants IPI, A'Hearn, Gilpin, and Sathe agreed and conspired with each other to obtain Plaintiffs' business through unlawful means, including but not limited to making and/or causing to be made knowingly false reports to the DOJ implicating Plaintiffs in an alleged kickback scheme with an employee of Amazon, despite the Defendants IPI, A'Hearn, Gilpin, and Sathe's knowledge of the legitimacy of all referral fees paid by Plaintiffs to referral sources in connection with the Amazon data center projects, breaching their duties as a majority stakeholder in a corporation to minority stakeholders, and tortiously interfering with contracts obtained by Plaintiffs.

186. Defendants IPI, A'Hearn, Gilpin, and Sathe agreed and conspired to procure the wrongful initiation of process or a wrongful criminal conviction against Plaintiffs. Defendants IPI, A'Hearn, Gilpin, and Sathe undertook to accomplish this unlawful goal by

engaging in various acts such as, but not limited to, coercing or influencing the statements or testimony of persons who would speak to the DOJ, withholding information about the propriety of payments of referral fees, and making presentations to the DOJ with the intent to secure a conviction or prosecution of Plaintiffs despite knowing that Plaintiffs had not committed any criminal act.

187.   Defendants IPI, A'Hearn, Gilpin, and Sathe pursued their unlawful acts or unlawful goal with the intent to create a pretext for terminating Plaintiffs' share of the joint venture and to divert the entirety of the Amazon data center development and ownership project—and potential future data center development and ownership projects, given Plaintiffs' inability to take advantage of opportunities in a booming industry while under investigation—to Defendants IPI, A'Hearn, Gilpin, and Sathe exclusively.

188.   As set forth below, these acts were tortious, amounting to (i) malicious prosecution, (ii) abuse of process, (iii) misappropriation of corporate opportunities, (iv) conversion, (v) civil theft, (vi) tortious interference with contract and/or business relations, (vii) tortious interference with prospective business and/or advantage, (viii) defamation per se, and (ix) defamation per quod.

189.   As a direct and proximate result of the conspiracy, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial.

## COUNT V

### (Malicious Prosecution)

### (Against Defendants IPI, A'Hearn, Gilpin & Sathe)

190.   Plaintiffs repeat, reallege, and reincorporate by reference the allegations set forth above as if fully set forth herein.

191.    Defendants IPI, A'Hearn, Gilpin, and Sathe manufactured allegations against Northstar and Mr. Watson induced the DOJ to open, and lobbied for its continuation for years, a criminal investigation into an alleged kickback scheme between Northstar and Mr. Watson and employees of Amazon, despite Defendants IPI, A'Hearn, Gilpin, and Sathe's knowledge of the legitimacy of Northstar's and Mr. Watson's business dealings with Amazon and used the same or similar manufactured allegations to induce a lawsuit by Amazon against Northstar and Mr. Watson. Indeed, Defendants IPI, A'Hearn, Gilpin, and Sathe had engaged their own referral partner and paid them referral fees in connection with their introduction to Northstar and Mr. Watson which was near-identical to Northstar and Mr. Watson arrangement which they alleged constituted a kickback scheme.

192.    As a result of Defendants IPI, A'Hearn, Gilpin, and Sathe's approaching the DOJ, the FBI and the U.S. Attorneys' Office for the Eastern District of Virginia conducted a criminal investigation into Northstar and Mr. Watson, which included seeking and executing a search warrant on Watson's home, seizure of Northstar's and Mr. Watson's property, and seizure of Northstar's investment entity bank accounts through civil forfeiture.

193.    Moreover, Defendants IPI, A'Hearn, Gilpin, and Sathe encouraged, by the same or similar manufactured allegations, Amazon to sever contractual relationships with Northstar and Mr. Watson and to institute a civil claim against them in the United States District Court for the Eastern District of Virginia. Defendants IPI, A'Hearn, Gilpin, and Sathe knew of or recklessly disregarded the false nature of the allegations.

194.    The criminal investigation of Northstar and Mr. Watson and Amazon's civil suit benefitted Defendants IPI, A'Hearn, Gilpin, and Sathe, who had acted to create the circumstances to terminate the joint venture with Northstar, take over Northstar's and Mr. Watson's business, and make immense profits for themselves personally and for their investors.

195.    Defendants IPI, A'Hearn, Gilpin, and Sathe's pursuit of the improper investigation by the DOJ and the institution of the civil suit by Amazon was not an endeavor to seek justice. Defendants IPI, A'Hearn, Gilpin, and Sathe's actions were a calculated attempt to create a pretext for terminating Northstar's and Mr. Watson's share in the parties' joint venture and diverting the entire Amazon data center development project and relationship for themselves. In fact, Defendants IPI, A'Hearn, Gilpin, and Sathe's own admissions demonstrate that they had planned to get rid of Northstar and Mr. Watson, their joint venture partners, for quite some time, and Defendants IPI, A'Hearn, Gilpin, and Sathe's prior, unsuccessful actions to subvert Plaintiff's ongoing business with Amazon only further demonstrate that Defendants IPI, A'Hearn, Gilpin, and Sathe acted with intent to injure Northstar and Mr. Watson rather than to pursue justice.

196.    Defendants IPI, A'Hearn, Gilpin and Sathe acted with malice, knew the investigation was legally indefensible, and wrongfully initiated and perpetuated the investigation against Northstar and Mr. Watson without probable cause.

197.    As a direct and proximate result of Defendants IPI, A'Hearn, Gilpin and Sathe's malicious prosecution, Northstar and Mr. Watson have suffered and continue to suffer damages in an amount to be proven at trial, and are entitled to such compensatory damages, plus punitive damages in an amount sufficient to punish Defendants IPI,

A'Hearn, Gilpin, and Sathe and to discourage, by way of example, others similarly situated to Defendants IPI, A'Hearn, Gilpin and Sathe from engaging in the conduct complained herein.

**COUNT VI**

**(Abuse of Process)**

**(Against Defendants IPI, A'Hearn, Gilpin & Sathe)**

198.   Plaintiffs repeat, reallege, and reincorporate by reference the allegations set forth above as if fully set forth herein.

199.   Defendants IPI, A'Hearn, Gilpin and Sathe made or caused to be made knowingly false allegations of a kickback schemes between Northstar and Mr. Watson and an employee of Amazon to the DOJ and to third parties, including Amazon. Defendants IPI, A'Hearn, Gilpin, and Sathe made these allegations with an ulterior purpose of having Northstar and Mr. Watson investigated and civilly or criminally prosecuted, creating a pretext for terminating Northstar's and Mr. Watson's share in the joint venture and diverting the entirety of the Amazon data center development projects to their exclusion, as well as tying up Northstar and Mr. Watson and their resources during the pendency of the investigation to take control of many additional data center development projects at the time the industry was booming.

200.   The allegations Defendants IPI, A'Hearn, Gilpin, and Sathe made resulted in the institution of a proceeding to seek a search warrant, which was issued, against Northstar and Mr. Watson, creating the necessary public circumstances—an FBI raid of Watson's home, among other things—to allow Defendants IPI, A'Hearn, Gilpin, and Sathe to send a removal notice and termination letters to Northstar and Mr. Watson and coopt their rightful managerial and ownership interests in the joint venture.

201.   Defendants IPI, A'Hearn, Gilpin, and Sathe knowingly and willfully made these false representations despite full and complete knowledge of the legitimacy of Northstar's and Mr. Watson's business dealings with Amazon to the DOJ and other third parties, including Amazon, which was improper. Defendants IPI, A'Hearn, Gilpin, and Sathe were privy to details of all Northstar's and Mr. Watson's business dealings by virtue of the parties' joint venture, and the due diligence done in advance thereof, and at all relevant times had the ability to contact Northstar and Mr. Watson directly with any questions or concerns regarding Northstar's and Mr. Watson's referral sources, referral fees, and relationships with employees of Amazon. Additionally, IPI, A'Hearn, Gilpin, and Sathe had engaged their own referral partner and paid them referral fees in connection with their introduction to Northstar's and Mr. Watson's in a near-identical arrangement to Northstar's and Mr. Watson's —an arrangement they only later alleged constituted an illegal kickback scheme.

202.   As a direct and proximate result of Defendants IPI, A'Hearn, Gilpin and Sathe's abuse of judicial process, Northstar and Mr. Watson have suffered and continue to suffer damages in an amount to be proven at trial, and are entitled to such compensatory damages, plus punitive damages in an amount sufficient to punish Defendants IPI, A'Hearn, Gilpin and Sathe and to discourage, by way of example, others similarly situated to Defendants IPI, A'Hearn, Gilpin and Sathe from engaging in the conduct complained herein.

**COUNT VII**

**(Misappropriation of Corporate Opportunity)**

**(Against Defendants IPI, A'Hearn, and Gilpin)**

203.    Plaintiffs repeat, reallege, and reincorporate by reference the allegations set forth above as if fully set forth herein.

204.    Plaintiffs had an interest or expectancy in building, operating, and owning commercial real estate such as the data centers for and on behalf of Amazon. Northstar and Mr. Watson had, in fact, spent years developing their business since Northstar's founding in 2000 and, beginning in or around July 2017, deliberately sought out opportunities to build, operate, and own data centers on behalf of Amazon.

205.    Defendants IPI, A'Hearn, and Gilpin, by contrast, operated a small start-up created for the purpose of providing equity capital to data center deals at the time they were introduced to Plaintiffs. Defendants IPI, A'Hearn, and Gilpin had only the experience of funding those deals and had neither abilities to obtain the work of building and operating data centers nor any working relationship with Amazon without the involvement of Plaintiffs.

206.    Defendants IPI, A'Hearn, and Gilpin unlawfully and through wrongful means diverted and misappropriated the opportunities for additional data center development projects, both with Amazon and other digital companies to themselves exclusively by making and/or causing to be made false representations regarding the legitimacy of Plaintiffs' business dealings with Amazon, specifically by alleging a kickback scheme between Plaintiffs and an Amazon employee, to the DOJ.

207.    Defendants IPI, A'Hearn, and Gilpin then restructured properties acquired to form Defendant STACK Infrastructure, to take over the business stolen from Plaintiffs.

208.    Defendants IPI, A'Hearn, and Gilpin are now one of the largest funders of data center development and acquisitions worldwide. Per IPI's own marketing material, Amazon is now one of its top three global relationships. STACK Infrastructure has also grown in almost an identical track and global geography as IPI, since Plaintiffs were wrongfully removed.

209.    As a direct and proximate result of Defendants IPI, A'Hearn, and Gilpin's misappropriation of the corporate opportunity from Plaintiffs, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial, and are entitled to such compensatory damages, plus punitive damages in an amount sufficient to punish Defendants IPI, A'Hearn, and Gilpin and to discourage, by way of example, others similarly situated to Defendants IPI, A'Hearn, and Gilpin from engaging in the conduct complained herein.

## COUNT VIII

### (Conversion)

### (Against Defendants IPI, IPI Fund I-A, IPI Fund I-B & STACK Infrastructure)

210.    Plaintiffs repeat, reallege, and reincorporate by reference the allegations set forth above as if fully set forth herein.

211.    Plaintiffs are the rightful partner to the joint venture agreement between the parties.

212.    Defendants IPI, IPI Fund I-A, IPI Fund I-B, and STACK Infrastructure unlawfully terminated Plaintiffs' share in the joint venture by termination on or about April 2, 2020.

213.    Defendants IPI, IPI Fund I-A, IPI Fund I-B, and STACK Infrastructure's actions were taken in an intentional and malicious manner so as to deliberately take

control of Plaintiffs' property and business relationships, even though Defendants were not entitled to do so.

214.    Defendants IPI, IPI Fund I-A, IPI Fund I-B, and STACK Infrastructure's actions were further taken with conscious disregard of Plaintiffs' rights so as to constitute oppression, fraud, and malice, such as to evidence an evil hand guided by an evil mind.

215.    Defendants IPI, IPI Fund I-A, IPI Fund I-B, and STACK Infrastructure wrongfully and without any justification continue to hold Plaintiffs' share in the joint venture and business relationships. As such, Defendants have converted Plaintiffs' rights to their own.

216.    As a direct and proximate result of Defendants IPI, IPI Fund I-A, IPI Fund I-B, and STACK Infrastructure's conversion, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial, and are entitled to such compensatory damages, plus punitive damages in an amount sufficient to punish Defendants and to discourage, by way of example, others similarly situated to Defendants from engaging in the conduct complained herein.

## COUNT IX

**(Violation of Colo. Rev. Stat. §§ 18-4-401, 18-4-405 – Civil Theft)**

**(Against Defendants IPI, A'Hearn & Gilpin)**

217.    Plaintiffs repeat, reallege, and reincorporate by reference the allegations set forth above as if fully set forth herein.

218.    Defendants IPI, A'Hearn, and Gilpin, by deception, knowingly came to exercise control over Plaintiffs' share in the joint venture with the intent to permanently deprive Plaintiffs of same. Specifically, Defendants knowingly reported false allegations of kickback schemes between Plaintiffs and an employee of Amazon to the DOJ.

219.    Defendants IPI, A'Hearn, and Gilpin intended to unlawfully convert and steal Plaintiffs' share in the joint venture for their own after Plaintiffs' refusal to sell their share in the joint venture to the Defendants outright.

220.    Defendants IPI, A'Hearn, and Gilpin's actions constitute civil theft pursuant to Colo. Rev. Stat. §§ 18-4-401 and 18-4-405.[4]

221.    As a direct and proximate result of Defendants IPI, A'Hearn, and Gilpin's civil theft, pursuant to Colo. Rev. Stat. §§ 18-4-401 and 18-4-405, Plaintiffs are entitled to recover all property obtained by theft and/or to an award of treble damages, as well as reasonable attorneys' fees and costs.

### COUNT X

### (Tortious Interference with Current Business/Contractual Relations)

### (Against Defendants IPI, A'Hearn, Gilpin & Sathe)

222.    Plaintiffs repeat, reallege, and reincorporate by reference the allegations set forth above as if fully set forth herein.

223.    Plaintiffs entered into agreements with Amazon to develop and operate data centers, into agreements with Christian for the referral of potential business, and with employment agreements with Camenson and Ramstetter.

224.    Defendants IPI, A'Hearn, Gilpin, and Sathe should have known of these agreements with Amazon by virtue of the parties' joint venture and knew of the referral relationship with Christian as well as Camenson and Ramstetter's employment by Plaintiffs.

---

[4] Under Colorado law, the elements of civil theft are the same as the elements of conversion as pleaded, *supra*, Count VII. *See Rino Fund, LLP v. Hutchins*, 215 P.3d 1186, 1195 (Colo. Ct. App. 2008).

225.    Notwithstanding that knowledge, Defendants IPI, A'Hearn, Gilpin and Sathe intentionally, knowingly, and through wrongful means interfered with Plaintiffs' contractual relations by, among other things, making a false report of alleged kickback schemes between Plaintiffs and employees of Amazon to the DOJ, for the purpose of creating a pretext to terminate Plaintiffs from the joint venture and diverting the Amazon data center development project to themselves exclusively, which they ultimately did. Defendants IPI, A'Hearn, Gilpin, and Sathe had engaged their own referral partner and paid them referral fees in connection with their introduction to Plaintiffs which was near-identical to Plaintiffs' arrangement which they alleged constituted a kickback scheme.

226.    Defendants likewise intentionally, knowingly and through wrongful means interfered with the contractual relationship that Plaintiffs had with Christian, as well as the relationships that it had with its employees, Camenson and Ramstetter, which led to further losses, including the usurpation of a corporate opportunity for Plaintiffs in the White Peaks deal as well as the loss of a proper referral relationship which was generating millions of dollars in fees from the successful referral.

227.    Defendants IPI, A'Hearn, Gilpin, and Sathe's interference was improper and prevented Plaintiffs from being able to fully exploit their benefit of the bargain under those agreements. Defendants IPI, A'Hearn, Gilpin, and Sathe's actions were a calculated attempt to create a pretext for terminating Plaintiffs' share in the parties' joint venture and diverting the entire Amazon data center development project for themselves.

228.    Further, by wrongly refusing to pay Plaintiffs the approximately $3.7 million of fees they had earned and were due in the months leading up to the April 2, 2020 raid, and by then wrongfully paying it to themselves, Defendants IPI, A'Hearn, Gilpin, and

Sathe caused Northstar and Mr. Watson to default on loans and payment obligations and to be unable to pay their office space rent, which led to a lawsuit by that landlord against Northstar. This forced Mr. Watson and Northstar to let almost all of its 40 employees go and prevented it from performing on its other investments and obligations, and from pursuing other data center or investment projects as that market became extremely profitable.

229.   As a direct and proximate result of Defendants IPI, A'Hearn, Gilpin, and Sathe's tortious interference with Plaintiffs' contractual relations, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial, and are entitled to such compensatory damages, consequential damages, plus punitive damages in an amount sufficient to punish Defendants IPI, A'Hearn, Gilpin, and Sathe and to discourage, by way of example, others similarly situated to Defendants IPI, A'Hearn, Gilpin, and Sathe from engaging in the conduct complained herein.

## COUNT XI

### (Tortious Interference with Prospective Business/Economic Advantage)
### (Against Defendants IPI, A'Hearn, Gilpin, Sathe, & STACK Infrastructure)

230.   Plaintiffs repeat, reallege, and reincorporate by reference the allegations set forth above as if fully set forth herein.

231.   By virtue of Plaintiffs' existing business relationship with Amazon and experience, expertise, and reputation in commercial real estate and the data center development industry at large, Northstar and Mr. Watson had prospective business opportunities with both Amazon and other digital companies to develop many additional data centers across the U.S., and even globally.

232.    Defendants IPI, A'Hearn, Gilpin, and Sathe had full knowledge and information of Northstar's and Mr. Watson's prospective business opportunities with Amazon and beyond as the data center development industry boomed by virtue of their involvement in the parties' joint venture. Indeed, the very purpose of Defendants IPI, A'Hearn, Gilpin, and Sathe's illegal scheme was to steal those opportunities away from Northstar and Mr. Watson and toward IPI and their own newly formed data center development and operation business, STACK Infrastructure.

233.    Defendants IPI, A'Hearn, Gilpin, and Sathe intentionally, knowingly, and through wrongful means interfered with Northstar's and Mr. Watson's prospective business opportunities by, among other things, making a false report of alleged kickback schemes between Northstar and Mr. Watson and employees of Amazon to the DOJ, to create circumstances to terminate the joint venture with Northstar, handicap Northstar and Mr. Watson with a lengthy federal investigation, take over Northstar's and Mr. Watson's business, and make immense profits for itself, its partners and affiliates, and investors.

234.    Further, by wrongly refusing to pay Plaintiffs the approximately $3.7 million of fees they had earned and were due in the months leading up to the April 2, 2020 raid, and by then wrongfully paying it to themselves, Defendants IPI, A'Hearn, Gilpin, and Sathe caused Northstar and Mr. Watson to default on loans and payment obligations and to be unable to pay their office space rent, which led to a lawsuit by that landlord against Northstar. This forced Mr. Watson and Northstar to let almost all of its 40 employees go and prevented it from performing on its other investments and obligations, and from

pursuing other data center or investment projects as that market became extremely profitable.

235.   As a direct and proximate result of Defendants IPI, A'Hearn, Gilpin, and Sathe's tortious interference with Northstar's and Mr. Watson's prospective economic advantage, Northstar and Mr. Watson have suffered and continue to suffer damages in an amount to be proven at trial, and are entitled to such compensatory damages, plus punitive damages in an amount sufficient to punish Defendants IPI, A'Hearn, Gilpin, and Sathe and to discourage, by way of example, others similarly situated to Defendants IPI, A'Hearn, Gilpin, and Sathe from engaging in the conduct complained herein.

## COUNT XII

### (Defamation Per Se)

### (Against Defendants IPI, A'Hearn, Gilpin & Sathe)

236.   Plaintiffs repeat, reallege, and reincorporate by reference the allegations set forth above as if fully set forth herein.

237.   Upon information and belief, Defendants IPI, A'Hearn, Gilpin, and Sathe published or caused to be published defamatory statements about Northstar and Mr. Watson, which statements imputed to Northstar and Mr. Watson the improper conduct of Northstar's and Mr. Watson's business and falsely imputed crime(s) to Northstar and Mr. Watson, namely that Northstar and Mr. Watson had engaged in bribery to obtain contracts from a business partner. Defendants made these statements, upon information and belief, in the context of two presentations made on or around February 20, 2020, and September 30, 2020, and in hundreds more communications, meetings or telephone calls to the DOJ, and to partners and lenders in the data center projects. In addition, Defendants published

similar statements to Amazon, which Amazon then repeated to the DOJ on the dates outlined above.

238.    These statements were unmistakably about Northstar and Mr. Watson and unmistakably defamatory and injurious to Northstar and Mr. Watson. The statements caused or deterred third parties from dealing with Northstar and Mr. Watson in the course of their business (such as deterring Amazon from continuing its business relationship with Northstar and Mr. Watson) and lowered Northstar's and Mr. Watson's reputation in the community.

239.    Upon information and belief, Defendants IPI, A'Hearn, Gilpin, and Sathe published these written or oral statements when, among other instances, they made knowingly false reports regarding alleged kickback schemes between Northstar and Mr. Watson and an Amazon employee to the DOJ and to other third parties, including Amazon itself.

240.    The statements constitute defamation *per se*, and thus, Northstar and Mr. Watson need not prove any special damages.

241.    Nevertheless, Northstar and Mr. Watson were injured by the publication of these statements, in an amount to be proven at trial, including monetary losses stemming from the loss of their business and other dealings with third parties, loss of income and credit, and emotional distress and personal humiliation.

**COUNT XIII**

**(Defamation Per Quod)**

**(Against Defendants IPI, A'Hearn, Gilpin & Sathe)**

242.    Plaintiffs repeat, reallege, and reincorporate by reference the allegations set forth above as if fully set forth herein.

243.    Upon information and belief, Defendants IPI, A'Hearn, Gilpin, and Sathe published or caused to be published statements concerning, among other things, an alleged kickback scheme implemented by Northstar and Mr. Watson that would pay employees of its contractual counterparties, namely Amazon, money in exchange for the award of contracts. Those statements included written or oral statements of fact to the DOJ and other third parties, including Amazon, including on the dates of the DOJ presentations: February 20, 2020, and September 30, 2020, as well as during hundreds more communications, meetings or telephone calls with the DOJ.

244.    Defendants IPI, A'Hearn, Gilpin, and Sathe's statements were defamatory in that they called into question Northstar's and Mr. Watson's business' integrity and legitimacy and impugned Northstar's and Mr. Watson's reputation.

245.     As a direct and proximate result of Defendants IPI, A'Hearn, Gilpin, and Sathe's defamatory statements published to third parties, Northstar and Mr. Watson have been harmed and are entitled to special damages and punitive damages, in an amount to be proven at trial, for specific monetary losses that were a result of Defendants' statements, including but not limited to the loss of contracts, business, credit, and income.

### COUNT XIV

### (Unjust Enrichment)

### (Against All Defendants)

246.    Plaintiffs repeat, reallege, and reincorporate by reference the allegations set forth above as if fully set forth herein.

247.    Plaintiffs entered into a joint venture with Defendants, whereby Plaintiffs were entitled to fees, a partnership interest, and a share of the 5 percent share of the joint venture and Defendants were entitled to a 95 percent share of the joint venture.

248.    Plaintiffs engaged in legitimate business in connection with the joint venture at all times, which Defendants knew when they reported false statements regarding Plaintiffs' alleged kickback scheme with an Amazon employee to the DOJ.

249.    Defendants have been unjustly enriched and have unfairly benefitted by diverting Plaintiffs' share in the joint venture from Plaintiffs to themselves and retaining the entire opportunity for themselves.

250.    Defendants have been unjustly enriched at Plaintiffs' expense.

251.    It is against equity and good conscience to permit the Defendants to retain the benefit they have obtained at Plaintiffs' expense.

252.    As a direct and proximate result of the Defendants' unjust enrichment, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial.

## COUNT XV

### (Intentional Infliction of Emotional Distress)

### (Against Defendants IPI, A'Hearn, Gilpin & Sathe)

253.    Plaintiffs repeat, reallege, and reincorporate by reference the allegations set forth above as if fully set forth herein.

254.    Defendants IPI, A'Hearn, Gilpin, and Sathe knowingly misled federal law enforcement in order to induce them to open and pursue an investigation against Mr. Watson, which could lead to felony charges and even a prison sentence. Defendants knew that doing so would cause Mr. Watson, a husband and father of four children at the time (he now has five children), severe emotional distress, as it would any person falsely accused of a crime.

255.    Defendants IPI, A'Hearn, Gilpin, and Sathe had no legal right to make these false allegations against Mr. Watson, which were baseless.

256.    As a direct result of these actions, Mr. Watson suffered severe emotional distress, going so far as to draft and send a suicide note to friends, family, and business associates.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, jointly and severally, as follows:

A.  Compensatory damages in an amount to be proven at trial given stated damages of $2 billion to Northstar and Mr. Watson;

B.  Treble damages, interest, attorneys' fees, and costs pursuant to 18 U.S.C. § 1964(c); Colo. Rev. Stat. § 18-17-106(7); and Colo. Rev. Stat. § 18-4-405;

C.  Punitive damages in an amount to be proven at trial;

D.  Consequential damages in an amount to be proven at trial;

E.  Special damages in an amount to be proven at trial; and

F.  For such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby request a jury trial on all the triable issues raised in this Complaint pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

DATED:  October 15, 2024

Respectfully submitted,

**GREENSPOON MARDER LLP**

By:  */s/ Brant D. Kuehn* _____

Brant D. Kuehn
1345 Avenue of the Americas
New York, New York 10105
Phone: (212) 524-5000

Alan Schindler, Colorado Bar No. 49270
1144 15th Street, Suite 2700
Denver, Colorado 80202
Phone: (303) 665-0860

*Attorneys for Plaintiffs*